Maria **RIVERA, Angel Santana, Diana Penaloza Arce, Enrique Arce, Santiago Mendez and Carmen Mendez, Plaintiffs,**

v.

**UNITED STATES of America; United States Department of Justice Drug Enforcement Administration; various named officers, including Special Agents Colon, Rivera, Timothy Sullivan, Wnukowski and Gabriella Zacco, Detectives Beck, Becheck, Casuso, Cebarello, Jones, Larkin and Velez, Investigators James J. Boylan, Robinson, Robert Robles, Rohman and Welch, Sergeants Cook and Murray, and John Doe and Jane Doe, et al., unknown officers and agents, Defendants.**

88 Civ. 2395 (MBM).

United States District Court, S.D. New York.

Jan. 11, 1990.

252

John D.B. Lewis, New York City, for plaintiffs.

Edward T. Ferguson, III, Asst. U.S. Atty., New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

This case arises from a search by the New York Drug Enforcement Task Force, made up of officers from the Drug Enforcement Administration, the New York State Police, and the New York City Police Department, pursuant to a warrant, of three apartments at 143 Bruce Avenue in Yonkers on January 8, 1987. The Task Force suspected that these apartments were being used as a cocaine distribution center, and believed that this search would uncover a large shipment of cocaine. The search produced no evidence linking the apartments or inhabitants to drug distribution.

The officer who submitted the affidavit in support of the search warrants was mistaken in his expectation that the apartments were linked to a cocaine distribution

ring. Law enforcement officers forcibly entered and searched plaintiffs' homes pursuant to a warrant based on that affidavit. Plaintiffs understandably believe that their rights were violated and seek legal redress. But just as a claim that the fruits of a search should be suppressed for lack of probable cause must be decided based only on what was known before the search, and specifically without considering that evidence in fact was found,[1] so too must a claim that plaintiffs' rights were violated for lack of probable cause be decided without considering that no evidence was found. That plaintiffs had no connection with the drug trade does not necessarily mean that the search of their apartments was unjustified.

The six plaintiffs are three couples who resided or were present in three of the ten apartments that were searched. The first couple, Santiago Mendez and Carmen Mendez, reside in apartment 2F and were present during the search. The second, Diana Penaloza Arce and Enrique Arce, reside in apartment 2J. Diana Penaloza Arce was present during the search, together with her infant. The third couple, Maria Rivera and Angel Santana, were in apartment 3D during the search; Maria Rivera resides in apartment 3D and Angel Santana was her guest.

Plaintiffs have sued the United States of America, the Drug Enforcement Administration of the United States Department of Justice, and 19 law enforcement officers who were members of the Task Force for allegedly violating several Constitutional, statutory, and common law rights. Specifically, plaintiffs allege that defendants violated their Fourth Amendment rights to freedom from unreasonable searches and seizures, their Fifth Amendment rights not to be deprived of liberty or property without due process of law and their right to equal protection of the laws under the Fifth Amendment[2] and 42 U.S.C. §§ 1981 and 1982.[3] Plaintiffs further allege that defendants committed the common law torts of false arrest, false imprisonment, malicious prosecution, trespass, assault, battery, intentional infliction of emotional distress, negligence, gross negligence, and prima facie tort.

As to each of plaintiffs' claims, defendants have moved to dismiss either because there is no claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), or because there is "no genuine issue as to any material fact," and therefore the moving party deserves "judgment as a matter of law." Fed.R.Civ.P. 56(c). The standards governing such motions are familiar. Dismissal for failure to state a claim is required when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Lieberman v. Reisman*, 857 F.2d 896, 898 (2d Cir.1988), *quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80. Summary judgment is called for when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.1988), *cert. denied* — U.S. ——, 109 S.Ct. 391, 102 L.Ed.2d 380.

1. "It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." [emphasis in original] *Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964) *quoting Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958).

2. The equal protection clause of the Fourteenth Amendment has been read into the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3. While plaintiffs' complaint alleged violation of a right to privacy under the First, Fourth, Fifth, and Ninth Amendments to the Constitution, plaintiffs' brief made no argument relating to such a right, so this claim is deemed abandoned. *Smith v. Walsh*, 519 F.Supp. 853 (1981). Furthermore, plaintiffs' privacy interests are protected by the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). If the Fourth Amendment was not violated, neither was plaintiffs' right of privacy.

## I

James Boylan, the case agent for the Task Force's investigation of the suspected narcotics operation, appeared before U.S. Magistrate Leonard Bernikow on January 7, 1987 to obtain search warrants for ten locations in Yonkers and the Bronx, including plaintiffs' apartments in Yonkers, apartments 3D, 2J, and 2F at 143 Bruce Avenue. The warrants authorized searches for cocaine, drug paraphernalia, drug records, firearms and other items related to the drug trade. The principal basis for seeking the warrants was information provided by a confidential informant (hereinafter "C/I"). (Boylan Aff. ¶ 3) For several months preceding the searches of January 8, 1987, Boylan had investigated a crack distribution organization in the Bronx led by Carlos Molina. Boylan learned from the C/I that in response to several police raids in October, 1986, the organization was moving its headquarters from the Bronx to 143 Bruce Avenue in Yonkers. The C/I informed Boylan that he had learned a shipment of cocaine would be arriving on January 7, 1987 and that he had recently seen large quantities of cocaine at 143 Bruce Avenue. Boylan was already familiar with 143 Bruce Avenue as a building known for a high volume of narcotics activity because in 1984, a raid on the building by the Task Force had yielded about 50 kilograms of cocaine, and in December 1986, a raid on the building had yielded approximately 20 kilograms of cocaine and over $700,000 in cash. (Boylan Aff. ¶ 8)

Boylan's affidavit to establish probable cause for the search may be fairly summarized as follows: First, Boylan asserted that the C/I told him that he had seen cocaine in apartments 4F (Molina's apartment), 3B, 2A, and 2H; second, Boylan asserted that the C/I told him that he had observed Molina use keys to open the doors to apartments 2F, 2H, and 2J; and finally, Boylan stated that the C/I had learned from Molina that Molina controlled apartments 2A, 2F, 2H, 2J, and 3D. Boylan checked the Con Edison records for all of those apartments. However, only the records for apartment 4F, listed to Molina, bore a familiar name. (Boylan Aff. ¶ 9)

The Task Force executed the ten search warrants simultaneously at approximately 6:00 a.m. on Thursday, January 8, 1987. A separate team supervised by one law enforcement official searched each apartment. Special Agent Timothy Sullivan of the Drug Enforcement Administration headed the team that searched Apartment 2F, occupied by plaintiffs Santiago Mendez and Carmen Mendez. Sergeant Thomas Murray of the New York City Police Department headed the team that searched apartment 2J, occupied by plaintiffs Diana Penaloza Arce and Enrique Arce. Sergeant William F. Cook of the New York City Police Department headed the team that searched apartment 3D, occupied by plaintiffs Maria Rivera and Angel Santana.

### The Search of Apartment 2F

The Mendezes dispute Special Agent Sullivan's assertion that members of the search team knocked and announced their presence before employing a battering ram. (Mendez Aff. ¶ 7) It is not disputed that Santiago Mendez opened the door and admitted the police before the door was rammed through. Some members of the search team had their weapons drawn when they entered the apartment. Santiago Mendez asserted that when he demanded an explanation for the search, none was given. When asked if there were any guns or drugs in the apartment, Santiago Mendez led Officer Sullivan to his bedroom where he kept a gun and some marijuana, which he gave to the officer. The Mendezes were forced to sit in the living room while the officers searched the bedroom. Carmen Mendez asked but was denied permission to call her job to say she would be late. (C. Mendez Aff. ¶ 3) No cocaine was found in the apartment. At the conclusion of the search, the Mendezes were given a copy of the search warrant. The Mendezes assert that the C/I could not have observed Molina use keys to their apartment because they had never given keys to anyone. (Mendez Aff. ¶ 4)

### The Search of Apartment 2J

Diana Arce disputes that the search team knocked and announced its presence before

beginning to batter the front door. (Arce Aff. ¶ 4) After the front door had already been knocked off its hinges, Diana Arce, carrying an infant in her arms, came to the door and attempted to open it. It was impossible by that point to open it, though, and she was asked to stand back while the search team knocked down the door. The officers entered the Arce apartment with drawn weapons. Diana Arce was told to sit in the living room and not to move. She asked but was denied permission to contact her husband or brother-in-law by telephone. As the search team left, they gave Ms. Arce a copy of the search warrant. No drugs or drug paraphernalia were found in the Arces' apartment. The Arces assert that it is wholly implausible that the C/I could have observed Molina use keys to their apartment. (Arce Aff. ¶ 3)

*The Search of Apartment 3D*

Plaintiffs Rivera and Santana dispute Officer Cook's contention that a member of the search team knocked and announced the presence of police before beginning to batter the door. (Rivera Aff. ¶ 5, Santana Aff. ¶ 4) Plaintiffs and defendants agree that the officers entered the apartment with at least one weapon drawn. (Rivera Aff. ¶ 6; Cook Dec. ¶ 4) Plaintiffs Rivera and Santana assert that they were followed by officers who wore no uniform or displayed no form of identification. They were chased into the bedroom, forced to lie on the floor, put their hands behind their heads, and remain silent. Rivera avers that when she demanded to know what was going on, one officer forced her head to the floor with his foot, trained his shotgun at her head, and told her to "shut up and be quiet." (Rivera Aff. ¶ 7) Santana asserts that when he moved his head to look up, the shotgun was then trained on him. (Santana Aff. ¶ 7)

Rivera asserts that after a few minutes, she was told to stand and was given a copy of the search warrant. Santana was then led out of the bedroom. Although Rivera

alleges she had already been patted down, she was then asked to take off all her clothes in front of three female officers near a bedroom window with no curtains. After having been visibly body searched, Rivera was handcuffed, hands behind her back, and taken to the living room. (Rivera Aff. ¶¶ 9, 10)

She and Santana were both forced to remain sitting on a mattress in the living room in handcuffs while the search proceeded. No drugs or weapons were found. (Cook Dec. ¶ 6) Nonetheless, many items were seized, allegedly for further investigation: Rivera's wallet with all her personal identification, telephone and Con Edison bills, her son's birth certificate, her driver's license, and personal photographs, among others. (Rivera Aff. ¶ 15; Santana Aff. ¶ 11; Plaintiffs' Brief at 49)

Officer Cook's description of the events differs in significant details. He asserts that both Rivera and Santana were searched for weapons and that Rivera was searched in the bathroom by one female Special Agent. He asserts also that the plaintiffs were seated on a couch during the search. (Cook Dec. ¶ 5) Officer Cook did not mention whether plaintiffs were handcuffed during the search or whether documents were confiscated.

## I. Plaintiffs' Fourth Amendment Claims

### a. *Sufficiency of Probable Cause*

■■■ Plaintiffs first challenge the sufficiency under the Fourth Amendment[4] of Boylan's affidavit to establish probable cause. The court that issues a warrant must determine probable cause or its absence in a "commonsense, practical" way, based on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). " '[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Gates* 462 U.S. at 235, 103 S.Ct. at 2330 *quoting Spinelli v. United States*, 393 U.S. 410, 419,

---

**4.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Fourth Amendment, U.S. Constitution.

256

89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). Furthermore, a search warrant is presumed valid. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The reviewing court evaluating the sufficiency of an affidavit already accepted as sufficient by a magistrate must afford the magistrate's determination " 'great deference.' " *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) *quoting Spinelli,* 393 U.S. at 419, 89 S.Ct. at 590. This deference to the magistrate's finding of probable cause encourages law enforcement officers to submit their evidence to a judicial officer before acting. *United States v. Beltempo,* 675 F.2d 472, 478 (2d Cir.1982); *cert. denied* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *see also United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). As the Supreme Court wrote in *Gates:*

> [T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis' for ... conclud[ing] that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.

*Gates,* 462 U.S. at 236, 103 S.Ct. at 2331 *quoting Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).

■ The magistrate who issued the warrant on Boylan's affidavit had a "substantial basis" to conclude that there was probable cause to search plaintiffs' apartments. The strongest evidence of probable cause in Boylan's affidavit was the information provided by the C/I. The Supreme Court has advised that "rigid legal rules are ill-suited" to the evaluation of informants' tips. *Gates* 462 U.S. at 232, 103 S.Ct. at 2329. It has abandoned an inflexible "two-pronged" test of an informant's "reliability" and "basis of knowledge" in favor of a more fluid "totality-of-the-circumstances analysis." *Id.* at 233, 103 S.Ct. at 2329. Examining a C/I's past record of credibility and the circumstances that generated the C/I's information, however, are still important components of the magistrate's determination of probable cause. Boylan's affidavit provided the magistrate with enough information to analyze both the C/I's credibility and the basis of his knowledge.

Boylan established the C/I's reliability by citing two separate occasions in October 1986 when the C/I had provided information that led to the seizure of large quantities of cocaine and "crack," weapons, and cash from apartments in the Bronx linked to Oscar Sanchez and Carlos Molina, two leaders of the drug organization under investigation. (Boylan Aff. ¶¶ 3–5) The affidavit stated that after those seizures, the C/I learned from Molina that the organization was moving its headquarters from the Bronx to 143 Bruce Avenue in Yonkers. (*Id.* ¶ 6)

Boylan noted that 143 Bruce Avenue had a history of significant narcotics activity. He mentioned a 1984 search at the building which yielded approximately fifty kilograms of cocaine. (*Id.* ¶ 8) He stated that in November 1986, the informant had seen multi-kilogram quantities of cocaine taken out of the building. In early December 1986, approximately 20 kilograms of cocaine and "crack" and over $700,000 in cash had been seized from one of the apartments in the building. (*Id.*) Although Boylan acknowledged that he was unaware of any connection between the prior seizures and Molina's organization, the building's history seemed to offer additional support for the C/I's information that several apartments in the building were used in the drug trade.

In addition to providing the magistrate with a basis to assess the informant's reliability, Boylan described the basis of the informant's knowledge. Boylan related that the C/I had told him during the week preceding January 8, 1987 that a member of the drug organization had told the C/I that a shipment of cocaine was expected to arrive at 143 Bruce Avenue on January 7, 1987. (*Id.* ¶ 7) Boylan described two occasions during the previous several weeks when the informant had been inside the building. (*Id.* ¶ 9) Boylan conveyed the C/I's assertion that he had directly observed cocaine in apartments 4F, 3B, and 2A, and that he had seen a man leave

apartment 2H carrying a kilo of cocaine. (*Id.*) The C/I also asserted that he had observed Molina use keys to apartments 2F, 2H, and 2J. (*Id.*) The only apartment among those for which warrants were sought as to which the C/I did not claim to have direct, first-hand knowledge was apartment 3D. However, with respect to that apartment, and the other six apartments searched at 143 Bruce Avenue, the C/I claimed that Molina had told him that they were being used by the drug organization. (*Id.*)

Boylan also checked the Con Edison records for these apartments. (*Id.*) The names associated with the apartments were unfamiliar to Boylan with the exception of "Molina," which was the name given for apartment 4F. The names on the Con Edison bills did not corroborate the C/I's information, but neither did they contradict it.

Using a totality-of-the-circumstances analysis, as *Gates* requires, 462 U.S. at 234, 103 S.Ct. at 2330, the magistrate had a "substantial basis" to conclude that evidence of drug trade would be found in plaintiffs' apartments. The informant had a record of proven reliability and had obtained the critical information about plaintiffs' apartments from Molina, one of the leaders of the drug ring. The informant asserted that he had directly observed Molina use keys to open the doors to several apartments. "[A] balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending [the] informant's tip," *Gates,* 462 U.S. at 234, 103 S.Ct. at 2330, supported a finding of probable cause. *See also United States v. Feliz–Cordero,* 859 F.2d 250.

### b. Nature of Warrant

■ Plaintiff asserts that the search warrants were facially devoid of probable cause because they were anticipatory warrants. An anticipatory warrant is "based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." 2 W. Lafave, *Search and Seizure* § 3.7(c) (2d ed. 1987). In his affidavit, Boylan stated that the shipment of cocaine was expected to arrive at 143 Bruce Avenue in Yonkers on January 7, 1987, the day the warrant was issued. (Boylan Aff. ¶ 7) Plaintiffs argue that because Boylan's affidavit was not specific as to time, the C/I could have learned of the shipment anywhere between December 29, 1986 and January 4, 1987, but we should assume that the events took place in the most remote part of that period. *United States v. Button,* 653 F.2d 319, 324 (8th Cir.1981). The information would then be "stale", and the warrant anticipatory.

■ This claim must be rejected. An anticipatory warrant is not prima facie evidence of lack of probable cause. Given that the warrant was requested and issued on the day the shipment was due to arrive, it is not properly categorized as an anticipatory warrant. But even if the warrant were considered anticipatory, that would not bar a finding of probable cause. As the Second Circuit has recently held, "[a]nticipatory warrants are not unconstitutional *per se,* and in the proper circumstances, may be an effective tool, both to fight criminal activity, and to protect individual Fourth Amendment rights." *United States v. Garcia* 882 F.2d 699 (2d Cir. 1989). *Garcia* requires that an affidavit supporting an anticipatory warrant show that the agent believes there will be a delivery, why he believes it, and how reliable are his sources of information. *Garcia* at 703. The Boylan affidavit showed all three. Even if the warrant were to be considered anticipatory, the affidavit was sufficient to establish probable cause.

### c. Validity of Warrant

■ *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) determines when a challenge to the validity of a search warrant affidavit merits a hearing. The challenger's allegations may not be merely conclusory; they must be supported by "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Franks,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). "Allegations of negligence or innocent mistake are insufficient" to impeach statements in an affidavit. *Id.*

Allegations must be of "deliberate falsehood or of reckless disregard for the truth" and "accompanied by an offer of proof." *Id.* If the affidavit would support a finding of probable cause without the contested statements, the challenge fails without need for further inquiry. *Id.* at 171–72, 98 S.Ct. at 2684–85; *see also United States v. Campino*, 890 F.2d 588 (2d Cir.1989). The same standard applies to deliberate or reckless omissions in an affidavit. *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.1985), *cert. denied* 474 U.S. 841, 106 S.Ct. 125, 88 L.Ed.2d 102 (1985).

Judicial precedent has established this standard of deliberate falsehood and reckless disregard to support a *Franks* challenge, but research has disclosed no case defining "reckless disregard" in this setting. The words themselves, though, suggest that "reckless disregard for the truth" means failure to heed or to pay attention to facts as Boylan knew them to be. If Boylan made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would show reckless disregard for the truth. Those statements would mandate a *Franks* hearing if, without them, there would not have been sufficient basis to issue the warrant.

■ Plaintiffs base their claim of deliberate falsehood and reckless disregard for the truth on what they regard as Boylan's intentionally misleading draftsmanship as to three points: chronology, the number of informants, and the circumstances under which the confidential informant conveyed information to Boylan. Plaintiffs' offer of proof is a detailed comparison of the January 7, 1987 affidavit with Boylan's October 6, 1988 declaration made in opposition to the motion. A detailed comparison of the two sworn statements, plaintiffs assert, reveals the deceit or recklessness necessary to require a *Franks* hearing. Their challenge fails, however, because they have not proved that Boylan's affidavit contained deliberate falsehoods or reckless disregard for the truth. Furthermore, plaintiffs' intricate comparison of Boylan's affidavit with his declaration made in opposition to the motion does not provide the kind of proof necessary. The Supreme Court has warned that "the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684; *accord Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. Plaintiffs offer of proof rests on just the kind of hypertechnical reading of the affidavit condemned by the Supreme Court.

With respect to chronology, plaintiffs assert that Boylan could have learned of the expected shipment any time between December 26, 1986 and January 4, 1987 and that his failure to specify the date was so misleading as to constitute recklessness. Plaintiffs contend that Boylan's affidavit contained a "misleading chronology" of events that "lulled" the magistrate into believing that the evidence of probable cause "was fresher than it actually was." (Plaintiffs' Brief at 28–29) Even if Boylan's affidavit does not make clear the precise date when Boylan learned of the shipment, failure to specify that date does not prove an intent to mislead or a reckless disregard for the truth. If Boylan had specified the exact date between December 29, 1986 and January 4, 1987 when the C/I learned of the expected shipment, that would not have altered the finding of probable cause. The affidavit could support a finding of probable cause with or without the precise date when the C/I learned of the shipment. Also, as noted above, *supra* at 257, anticipatory warrants are not *per se* unconstitutional. Courts have rejected staleness arguments similar to these. *See, e.g., United States v. Harris*, 403 U.S. 573, 579 n. *, 91 S.Ct. 2075, 2079–80 n. *, 29 L.Ed.2d 723 (1971), *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985).

Plaintiffs allege that Boylan misled the magistrate about the C/I's source of knowledge. Boylan's affidavit stated the C/I learned of the shipment from "one of the above-named members of [the drug] organization." (Boylan Aff. ¶ 7) Boylan's October 6, 1988 declaration specifically names Carlos Molina as the source of the

information. (Boylan Dec. ¶ 6) Plaintiffs allege that Boylan did not mention Molina in the affidavit because he wanted the magistrate to think that the C/I had received information from multiple sources in the drug organization and not just from Molina. (Plaintiffs' Brief at 29–30) The language of the affidavit—"*one of* the above-named members" (emphasis added) —itself belies plaintiffs' claim of fraudulently implied numerosity. Moreover, in his Supplemental Declaration of August 15, 1989, Boylan asserts that he did not disclose Molina as the source for fear of revealing the C/I's identity. (Boylan Supp. Dec. ¶ 2) As defendants point out, had Boylan named Molina, the leader of the drug organization, specifically, rather than simply identifying the source of information as one of the members of the drug organization, the affidavit's showing of probable cause would have been strengthened, not weakened. (Defendants' Reply Brief at 14) Omission of Molina's name does not prove that Boylan intended to deceive the magistrate or that he recklessly disregarded the truth by leaving out Molina's name. The most plausible explanation for his failure to mention Molina specifically is the one that Boylan offered in his declaration, *i.e.*, that to elucidate all the circumstances of how the C/I acquired his knowledge would identify the C/I too closely. But in any event, whether the C/I learned about the shipment from several members of the drug organization or from only one is not a material issue. In either case, there is other information sufficient to establish probable cause, so that a *Franks* hearing is not required.

Next, plaintiffs cast doubt on Boylan's affidavit because he neglected to disclose that the C/I had gathered key information during Christmas and New Year's parties at Molina's 143 Bruce Avenue apartment. (*Compare* Boylan Aff. ¶¶ 7, 9 *with* Boylan Dec. ¶¶ 6–7) Plaintiffs speculate, on no supporting evidence, that Molina must have been drunk or drugged when he confided to the C/I which apartments were under his control. By failing to mention the circumstances under which the C/I gathered information, plaintiffs allege, Boylan "performed subtle but significant surgery on the informant's narrative" (Plaintiffs' Brief at 32) in an effort to deceive the magistrate or in reckless disregard for the truth.

In response, Boylan asserts that he omitted these settings out of a need to protect the identity of the C/I. (Boylan Supp.Dec. ¶ 2) Also, if the magistrate had questions about how the information was obtained, Boylan was available to answer those questions when he submitted his affidavit to the magistrate. Furthermore, there is no basis to believe that Molina had a reason to lie to the C/I about the arrival of a shipment of cocaine or about which apartments he controlled. To the contrary, Molina had reason to tell the truth, because, as we learn from Boylan's later declaration, Molina was soliciting the C/I's advice about the installation of an alarm system and video camera at 143 Bruce Avenue to protect against drug raids by law enforcement officials. (Boylan Dec. ¶ 7) Had Boylan included in the affidavit more details of how the C/I had obtained his information, the showing of probable cause would have been stronger, not weaker. The omission that this conversation occurred at a party did not so fundamentally alter the depiction of the circumstances as to constitute falsehood or reckless disregard.

Although plaintiffs do not contend that Boylan's account contained any misstatements or material omissions, they criticize the affidavit for providing misleading information about prior drug seizures and prosecutions that resulted from information obtained through the C/I. (Plaintiffs' Brief at 34–36; Boylan Aff. ¶¶ 3–5, 8) There is substantial evidence to show that the C/I previously had provided information that resulted in arrests and prosecutions relating to the Task Force's investigation of Molina's drug organization, and that Boylan was correct in so stating. (Boylan Aff. ¶¶ 4–5; August 15, 1989 Dec. of Edward Ferguson III, Assistant U.S. Attorney) In his declaration, Edward Ferguson, attorney for the defendants, provides detailed information on the arrests, seizures, and prosecutions that resulted from the C/I's tips in October, 1986. Again, there is no basis for

a finding of deliberate falsehood or reckless disregard.

Plaintiffs assert that Boylan's reference to previous drug seizures at 143 Bruce Avenue was an attempt to place plaintiffs under suspicion by association. Judging the affidavit in a "commonsense and realistic fashion," *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), information about prior drug activity at this address was pertinent to a magistrate's determination of probable cause. Previous large-scale drug activity at 143 Bruce Avenue could show a connection to Molina's drug trafficking organization, or it could show at least a passive participation by the building's inhabitants in drug trade on the premises, for example by allowing their apartments to be used. Previous drug activity at that address was one factor in a showing of probable cause. Nor did Boylan exaggerate the importance of this fact; he stated directly in his affidavit that he did not know whether the previous seizures were related to the Molina organization. (Boylan Aff. ¶ 8) Boylan did not lie about previous drug activity in the building or omit information that made what was mentioned misleading.

Finally, plaintiffs allege that Boylan's most reckless disregard for the truth was his cursory review of Con Edison records which showed unfamiliar names. (Plaintiffs' Brief at 37–40; Boylan Aff. ¶ 9(f)) The most important point in the context of a *Franks* challenge is that Boylan informed the magistrate that the search did not yield familiar names. He did not falsify or misrepresent the results of the Con Edison search. Plaintiffs argue that Boylan should have concluded that the names on the Con Edison records were those of real persons living in the apartments, and not simply fictitious names. They argue that proceeding to seek a search warrant when the names of the inhabitants were unfamiliar constituted reckless disregard for the truth. But the unfamiliarity of the names in the Con Edison records neither strengthened Boylan's showing of probable cause nor diminished it. He stated in the affidavit that he was not disturbed by his lack of familiarity with the names because drug traffickers frequently use fictitious names. (Boylan Aff. ¶ 9(f)) *See also Fama*, 758 F.2d at 838 ("[a]n agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application") and *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984) ("Narcotics traffickers commonly use aliases and carry false identification.")

Plaintiffs press the claim that if Boylan had examined the underlying billing records he would have found that the names to which Con Edison service had been billed were unchanged for several years, which arguably would have contradicted the conclusion that the drug ring had relocated from the Bronx to those apartments. Here, plaintiffs assert in essence that Boylan should have conducted a more thorough investigation. But this is at most a charge of negligence, which is not sufficient to challenge the validity of a warrant. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. Boylan's alleged failure adequately to assess the Con Edison records does not constitute a substantial preliminary showing that a false statement was knowingly or intentionally made, or that one was made with serious doubts as to its truth.

In short, none of plaintiffs' allegations about the inadequacy of the warrant is sufficient to require an evidentiary hearing under *Franks*. To obtain a *Franks* hearing, plaintiffs must offer proof that Boylan's deliberate falsehood or reckless disregard for the truth undermined the affidavit to the point where it could not support a finding of probable cause. Plaintiffs have failed to submit such proof. Boylan's affidavit provided a substantial basis for the magistrate's finding of probable cause and for the issuance of the warrants.

**1. Plaintiffs' Fifth Amendment Claims**

■ Plaintiffs' substantive due process claims must be dismissed for failure to state a claim under the Fifth Amendment. *Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) holds that if law enforcement officials are alleged to have used excessive force during a seizure, such a claim should be analyzed

only under the Fourth Amendment's "objective reasonableness" standard, and not under a substantive due process standard. The case at bar is governed by the Fourth Amendment because it involves a seizure during which the plaintiffs' liberty was restrained. *Graham,* 109 S.Ct. at 1871.

Similarly, plaintiffs' procedural claims for deprivation of liberty and property without due process must be dismissed. In police misconduct cases like this one, the due process clause is satisfied if plaintiffs have adequate post-deprivation remedies. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984); *Ingraham v. Wright,* 430 U.S. 651, 682, 97 S.Ct. 1401, 1418, 51 L.Ed.2d 711 (1977). Plaintiffs do have such remedies; they are pursuing them here.

2. Plaintiffs Equal Protection Claims under § 1981 and § 1982

Section 1981 of U.S.C. Title 42 guarantees to

[a]ll persons within the jurisdiction of the United States ... the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and ... [to] be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Although § 1981 applies principally to contract disputes, *see e.g. Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975); *Krulik v. Board of Education of the City of New York,* 781 F.2d 15, 23 (2d Cir.1986), it has also been used in some circuits to remedy racially motivated abuse of state authority. *Coleman v. Franklin Parish School Board,* 702 F.2d 74 (5th Cir.1983), *Washington v. Simpson,* 806 F.2d 192 (8th Cir.1986), *Evans v. McKay,* 869 F.2d 1341 (9th Cir.1989). The Supreme Court has held that the statute applies to discrimination on the basis of ethnicity as well as race. *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 608–610, 107 S.Ct. 2022, 2025–2027, 95 L.Ed.2d 582 (1987).

Plaintiffs claim they were discriminated against on the basis of their Hispanic ethnicity. Specifically, they allege that their apartments were singled out to be searched because they have Hispanic surnames. (Amended Complaint ¶¶ 45–46) They also allege that the agents' use of excessive force was motivated by racial prejudice and that the agents made thinly disguised ethnic slurs against them (a comment about an apartment being roach-infested and an implication by an officer that one of the plaintiffs could not legitimately afford the high cost of her apartment, Plaintiffs' Brief at 63).

To prevail, plaintiffs must show that "the defendants' acts were purposefully discriminatory, and racially motivated." *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Plaintiffs fail to produce evidence of racial or ethnic motivation, circumstantial or otherwise. Plaintiffs do not establish any connection between defendants' alleged knowledge of plaintiffs' ethnicity and the alleged police misconduct. Plaintiffs present no evidence to suggest that defendants singled out some tenants' apartments over others in selecting which apartments to search. Plaintiffs do not allege that defendants referred directly to plaintiffs' ethnicity before, during, or after the search. Nor do they show that law enforcement agents routinely treat white people differently from the way they treat Hispanic people during similar searches. Because no evidence of intentional discrimination or ethnic motive has been presented, the § 1981 claim must be dismissed for failure to state a claim.

Plaintiffs fail to state a claim also under 42 U.S.C. § 1982, which in relevant part guarantees to "[a]ll citizens of the United States ... the same right ... as is enjoyed by white citizens ... to ... hold ... real and personal property." 42 U.S.C. § 1982. Like § 1981, § 1982 requires that the plaintiff show racial or ethnic animus toward a protected class. *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594; *Katz v. Mor-*

*ganthau,* 709 F.Supp. 1219, 2135 (S.D.N.Y. 1989). Plaintiffs present no evidence to prove racial animus, so this claim must be dismissed.

### 3. Common Law Tort Claims

Plaintiffs allege that in obtaining and executing search warrants for their apartments, defendants committed the common law torts of false arrest and false imprisonment, malicious prosecution, trespass, assault and battery, intentional infliction of emotional distress, negligence, gross negligence, and prima facie tort. (Amended Complaint at 19–31) Under the Federal Tort Claims Act, 28 U.S.C. § 2679(b)(1), as amended in 1988 by Pub.L. No. 100–694, 102 Stat. 4564 (the "FTCA"), an action against the United States under the FTCA is the exclusive remedy for common law torts committed by a federal employee acting within the scope of his employment. Law enforcement defendants are absolutely immune from suit for common law torts so long as their conduct is discretionary and within the scope of their official duties. *Yalkut v. Gemignani,* 873 F.2d 31, 34 (2d Cir.1989), *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 584, 98 L.Ed.2d 619 (1988).

There is no alleged conduct in this case unconnected to the officers' duties or beyond their authority. The most serious allegations of abuse of authority are made by Rivera and Santana, who claim that they were handcuffed and that Rivera was strip searched unreasonably. Even these alleged acts were well within the scope of defendants' official duties in executing a search. Rivera and Santana were handcuffed and Rivera was strip searched before defendants had reason to suspect that the apartment's occupants posed no threat. Before conducting the search of apartment 3D, the officers had probable cause to believe that they would find evidence of drug activity in the apartment and every reason to suspect that defendants might be armed. Their precautionary handcuffing of Rivera and Santana and their strip search of Rivera were reasonable steps to ensure their own safety in a situation in which they expected to find armed drug traffickers. These precautionary acts were carried out in a professional manner, and at a point when they seemed appropriate security measures. For this reason, the individual defendants are absolutely immune from the common law tort claims alleged against them. Defendants' motion for summary judgment is granted as to the common law tort claims.

### 4. Execution of the Searches

#### a. Knock-and-Announce Statute 18 U.S.C. § 3109

Plaintiffs assert that the manner in which the individual defendants [5] gained entry to plaintiffs' apartments and executed the search warrants violated the law. Plaintiffs argue first that the agents violated the duty to "knock and announce" their identity and purpose, as required by 18 U.S.C. § 3109. The statute provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

There is a substantial dispute about whether the officers adequately announced themselves at plaintiffs' apartments and whether their alleged non-compliance would have been justified by the exigent circumstances they believed existed. *See United States v. Spinelli,* 848 F.2d 26, 29 (2d Cir.1988). The threshold legal issue, however, is whether there would be any individual liability on the part of the agents if indeed they did violate the knock-and-announce statute. Drawing every factual inference in favor of plaintiffs, as I must on a summary judgment motion, I must infer that the officers did not comply with the statute, and that there were no exigent circumstances justifying their non-compliance. Nonetheless, there is no basis for a private right of action for money damages against defendants.

---

**5.** Investigator Boylan had no role in executing the search warrants for plaintiffs' apartments, and is not a defendant in this action. (Boylan Dec. ¶ 10)

Whether a private right of action exists is an issue of statutory construction. *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979). As the Supreme Court has emphasized, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Id.* Whether a statute creates a private right of action is ultimately "one of Congressional intent, not one of whether ... [the court] thinks it can improve upon the statutory scheme that Congress enacted into law." *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981) *quoting Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Applying the four-factor analysis employed by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) to determine whether Congress intended to create a private right of action [6], the first two *Cort* factors are dispositive in this instance. If "[t]he language of the statute and its legislative history do not suggest that the ... [statute] was intended to create federal rights for the especial benefit of a class of persons," then the court need not address the statute's purposes or its relation to state law. *California v. Sierra Club*, 451 U.S. 287, 297–98, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981).

Neither the language of the statute, nor its legislative history, nor judicial precedent suggests that Congress intended to create a private right of action for money damages under the knock-and-announce statute. On its face, the statute creates a right for officers forcibly to enter premises to execute a warrant. It is not a restrictive statute but rather an enabling statute permitting officers to enter under certain circumstances. It does not on its face create a right in citizens to sue for damages if notice is not given.

Nor does the legislative history of 18 U.S.C. § 3109 suggest that a private right of action was intended. Although the current version of the law was passed in 1948 (June 25, 1948, c. 645, 62 Stat. 820), the law has been unchanged in substance since 1917. (June 15, 1917 c. 30, Title XI, §§ 8, 9, 40 Stat. 229). The 1917 statute was passed as part of a larger body of legislation that addressed in omnibus fashion the criminal law concerns of that day.[7] There is nothing in the history of 18 U.S.C. § 3109 to suggest that Congress intended there to be a private right of action against individual officers who failed to comply with the statute.

Nor does judicial precedent suggest a private right of action. Rather, prior cases have dealt with standards for unlawful arrest and suppression of evidence obtained in violation of the knock-and-announce statute. *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (arrest and seizure of evidence invalidated because plaintiff did not receive notice of officers' purpose before they broke down door) *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) (arrest and seizure of evidence invalidated because federal officers opened a closed but unlocked apartment door without first announcing their identity and purpose) Courts have also established several significant exceptions to compliance with the statute. *United States v. Artieri*, 491 F.2d 440 (2d Cir.1974), *cert. denied* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 670 (When officers knock on the doors of people they believe

---

**6.** In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are pertinent. First, is the plaintiff one of the class for whose particular benefit the statute was enacted? Second, is there any indication of legislative intent to create a right of action? Third, is it consistent with the underlying purposes of the legislative scheme to infer such a remedy? And fourth, is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

**7.** Title XI dealing with search warrants, which is the precursor of 18 U.S.C. § 3109, was passed as part of H.R. 291 in 1917 "to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal law of the United States, and for other purposes."

to be experienced narcotics violators, they need not announce their purpose because the persons within may be assumed to know that purpose.) *United States v. Spinelli*, 848 F.2d 26 (2d Cir.1988) (Exigent circumstances may excuse noncompliance with the knock-and-announce requirement by officers executing a search warrant if they believe an emergency exists and their belief is objectively reasonable.) No case has been cited or located in which a court has found a private right of action as a remedy for violation of the knock-and-announce statute. Therefore, plaintiffs' claim regarding the knock-and-announce statute must be dismissed for failure to state a claim.

### b. Reasonableness of the Searches

 Notwithstanding that there was probable cause to search, and that the agents had a proper warrant, that warrant did not place the occupants of the apartment or their possessions at the agents' mercy, beyond the protection of the Fourth Amendment. Governmental conduct throughout a search or seizure must meet a standard of objective reasonableness. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). Officers' actions must be "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, ── U.S. ──, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967), *quoting Terry v. State of Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). However, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant—subject, of course, to the general Fourth Amendment protection 'against unreasonable searches and seizures.' " *Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979).

 Plaintiffs contend that the manner in which the individual defendants executed the search warrants violated the Fourth Amendment. (Plaintiffs' Brief at 45–50) The three sets of plaintiffs criticize the "ferocity" of the searches (Plaintiffs' Brief 48–50) and allege that the searches were excessively thorough. (Rivera Aff. ¶ 14, Arce Aff. ¶ 7, Mendez Aff. ¶ 10) Plaintiffs Carmen Mendez and Diana Penaloza Arce assert that they were denied the right to make a telephone call during the search. (Arce Aff. ¶ 6, Mendez Aff. ¶ 3) Plaintiffs Rivera and Santana allege that they were held at gunpoint, handcuffed, and that plaintiff Rivera was strip searched, all in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures.

It was within the officers' discretion for the search teams to approach the apartment doors and to enter the three apartments in question with drawn weapons. Believing there was drug activity in these apartments, the officers had a reasonable basis to think that the occupants would be armed. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *United States v. Barlin*, 686 F.2d 81, 86 (2d Cir.1982). They had every reason in approaching a dangerous and uncertain situation to "exercise unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981); *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

Once the officers entered Rivera's apartment, their first priority was to secure the inhabitants. According to Rivera's testimony, the officers followed Rivera and Santana to the bedroom with drawn weapons, and told them to get down on the floor and to put their hands behind their heads. It was reasonable to have the occupants lie on the floor because from that position it would be difficult for them to grab the officers' guns or to reach for their own weapons. When Rivera began to ask questions, she asserts that her head was forced to the floor and a shotgun was trained at her head. (Rivera Aff. ¶¶ 6, 7) Although

the alleged police conduct was threatening and aggressive, it was not unreasonable under the circumstances. The officers at this point thought that they were dealing with drug traffickers who might be armed.

After Rivera had been permitted to stand and had been given a copy of the search warrant, she was told to undress and her body was visibly searched by three female officers. According to Rivera's affidavit, she was patted down before she was told to take off her t-shirt, sweatpants, and underwear. (Rivera Aff. ¶ 9) The body search of Rivera was conducted without physical contact, in a minimally intrusive manner. *See United States v. Ogberaha*, 771 F.2d 655, 659 (2d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986). Rivera has made no allegation that the officers attempted to humiliate her or do anything other than visibly search her body for concealed weapons. At the time she was searched, the officers had not yet searched the apartment and were unaware that there was no evidence of drugs or weapons in apartment 3D. Under all of the circumstances, it was not unreasonable for the officers to make sure that Rivera was not carrying a concealed weapon under her clothing, which may have appeared baggy. *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir.1978); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985).

Plaintiffs further allege that it was "unnecessary" for the officers to handcuff Rivera and Santana. (Plaintiffs' Brief at 47) But handcuffing was objectively reasonable as a precautionary measure. Again, at the time Rivera and Santana were handcuffed, the officers had not yet searched the apartment and could not assess the level of danger in the situation. Handcuffing plaintiffs prevented flight and the potential destruction of evidence, and minimized the risk of harm to the search team. *Michigan v. Summers* 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981).

Similarly, forbidding plaintiffs Diana Arce and Santiago and Carmen Mendez to make telephone calls during the search (Plaintiffs' Brief at 48) was reasonable for at least three reasons. It obviated the possibility that the occupants might call others to warn them to dispose of contraband, to flee, or to help escape; furthermore, forbidding phone calls during a search is a routine safety measure. (Boylan Supp. Dec., ¶ 4)

Plaintiffs' claim that the searches were excessively thorough is without merit. Although plaintiffs understandably feel that their apartments were "ransacked" (Rivera Aff. ¶ 14), it was not only defendants' option, but their obligation, to perform a comprehensive search.

■ Finally, plaintiffs claim it was unreasonable to seize documents from Rivera's apartment. (Plaintiffs' Brief at 49) That claim raises more difficult issues, and they must be resolved by a jury. The Fourth Amendment requires that no warrants shall issue but those "particularly describing ... things to be seized." A search must be confined to the terms and limitations of the warrant authorizing it. *United States v. Matias*, 836 F.2d 744, 747 (2d Cir.1988) *quoting Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n. 7, 91 S.Ct. 1999, 2003–004 n. 7, 29 L.Ed.2d 619 (1971). Also, searches for documents must be "conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976). This means that the items seized pursuant to a warrant must be 1) named in the warrant, 2) the fruits, instrumentalities, or evidence of a crime discovered in the course of a search of legitimate scope, or 3) property which presents a special reason for seizure, such as officers' safety or the safekeeping of valuables like cash or jewelry. *Dale v. Bartels*, 732 F.2d 278, 284 (2d Cir.1984).

■ The warrants to search plaintiffs' apartments authorized the officers to seize "documents, records, papers, notes, photographs ... and other things that contain records, or are themselves evidence of violations of Title 21, U.S.C. §§ 841(a)(1), 846,

848." Plaintiffs Rivera and Santana allege that the property seized included bank statements, personal papers, Rivera's wallet with all her personal identification, Santana's driver's license, a family photograph, and other personal identification. These personal items showed no apparent connection to illegal drug activity, as required by the warrant. Moreover, when these documents were seized, a thorough search of the apartment had yielded no evidence whatever of drug trafficking. Which is to say, the officers by then were on notice, or should have been, that their suspicions may well have been wrong, as in fact they turned out to be.

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) established a federal common law cause of action for damages caused by federal agents acting "under color of [their] authority" in violation of a claimant's Fourth Amendment rights. *Id.* at 389, 91 S.Ct. at 2001. A *Bivens* action has two elements: first, claimant must show deprivation of a right secured by the Constitution and the laws of the United States; and second, claimant must show that the defendant acted under color of federal law. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185, *quoting Mahoney v. National Organization for Women*, 681 F.Supp. 129 (D.Conn.1987). Plaintiffs state a claim with respect to their unreasonable seizure assertion because they have an enforceable right under the Fourth Amendment to be free of unreasonable seizures and because the Drug Task Force acted under color of federal law. (Defendants' Brief at 1) Whether the agents seized property in violation of the warrant presents a triable issue of fact.

\* \* \*

In sum, defendants' motion for dismissal and summary judgment is denied as to the seizure of documents from plaintiff Rivera's apartment, and in all other respects is granted. Only Rivera and Santana, whose documents were seized, remain as plaintiffs.

SO ORDERED.